We will hear argument next in number 222239, Elkin v. Veterans Affairs. Mr. Solomon. Good morning, Your Honors, and may it please the Court. In the hearing below, the administrative judge limited the scope of potential reprisals by finding that certain of Dr. Elkin's disclosures were not protected sublime activity. This had a cascading effect that resulted in a finding against Dr. Elkin. For example, the administrative judge discussed Dr. Elkin's position that the genesis of hostile treatment by nursing staff related to Dr. Elkin's blood pressure disclosure, but did not broach this much further because they held that the blood pressure disclosure was not protected whistleblower activity. Similarly, Dr. Elkin was admonished for failure to complete certain administrative tasks that Dr. Elkin alleges were assigned specifically because he disclosed that his workload was excessive to the point... Counselor, as a preliminary matter, are you asking us to review the MSPB's credibility determinations? Is that something you're asking? So the MSPB's credibility determinations does state at the beginning that they relied on the Hillen factors, but throughout the decision they don't actually rely on those, so it's a procedural issue. I do have an issue with that, but however, what I'm talking about now and kind of our general thesis of the case, I realize that the facts are virtually unreviewable under the substantial evidence standard. However, what I'm looking at more is the mixed question of law and fact, and specifically the question of law attached to that. Understanding what the disclosures were, do they constitute protected disclosure? Specifically, is it a substantial and specific danger to the public health or safety, and therefore a protected disclosure? After he was admonished for failure to complete certain administrative tasks, once again the administrative judge found Dr. Elkin's claims about his workload were not protected, and therefore the admonishment was not a result of unlawful reprisal. And to clarify, we are not asking this court to determine if actions like hostile treatment by nursing staff really did arise from the blood pressure disclosures, or if the admonishment really did result from the disclosure regarding workload. We are asking the board's narrow reading of what constitutes a whistleblower disclosure to be corrected, and for the trier of fact to consider for the first time if these actions were connected. The board's incorrect legal conclusions come from an inconsistent reading of the words substantial and specific when considering substantial and specific danger to public health or safety. They also come from a failure to weigh the severity of the medical issues. What do you think is the correct interpretation of the legal words that you're saying the board misinterpreted? Well, I think the correct interpretation is what they use in some of their other cases, such as Chavez and Parikh. I apologize for the pronunciation on that. But, for example, in Chavez, there was a medical cart that was not being cleaned at the end of nurse shift changes, and as a result, at the beginning of the next shift, the nurses had to clean the cart, and it resulted in a delay of the nurse being available for patient care. That was considered a substantial and specific danger. Now, in reliance on the Chamber's factors and the agency's arguments, they state that, for example, for blood pressure, the blood pressure disclosure, that because Dr. Elkin did not provide the name of the patient, it wasn't substantial or specific. However, the Chamber's factors uses an operative word in their decision of or. It talks about if there's no specific person, place, or thing, then it's not going to be specific enough for this substantial and specific. What's your best argument that the MSPB erred in finding the disclosures not protected? Could you give me kind of your best argument in that regard? Well, for example, the blood pressure disclosure, the patient's blood pressure was 200 systolic pressure. If untreated, that's an inevitable heart attack. It's an emergency medical condition. The nurse had read it as 118, not even remotely close. That's perfectly normal and healthy. If Dr. Elkin didn't already mistrust the nurse's ability to read blood pressure, and he did not double-check that patient's blood pressure, the best-case scenario is that patient has a heart attack and recovers. The worst-case scenario is obviously the patient's terminal. There's other board decisions. For example, the Parikh decision that I referenced, where it was a patient had a delay in medical care, and they had to end up being intubated. This is really no different. There's a delay in treatment because an emergency medical condition was completely missed. And just kind of as a matter of public policy, if we're talking about what a protected- Remind me, what did the board say about this incident? I felt the board found that there just wasn't good enough evidence that this was the one, that the 200 was actually an accurate reading and that there actually was a problem here. Not that it wasn't a big enough problem, but I thought the board found that there just did not credit Dr. Elkin's testimony about what happened. Just correct me if I'm wrong about that. Yes, so what the board held was that this was kind of more of a routine workplace disagreement about how the numbers were read, but there was no evidence below that would explain other than kind of a backhanded statement by the agency's leadership executive stating something along the lines of because the patient had to wait for an hour, maybe their blood pressure skyrocketed in the interim. But there was no explanation given that that could be offered to explain this increase. But it appears that the judge did take it at face value that it was either read incorrectly or that it increased, but there's no real explanation for the conclusion that this wouldn't rise to a disclosure, other than their argument that this was not a substantial and specific danger, because just consistently throughout their decision, they seemed to raise that to such a high level of a burden that needs to be met with a substantial and specific danger, and a blood pressure misread, in their opinion, doesn't appear to reach that level. Though this case can and should be decided on the plain reading of the language, as the patient safety issues raised by Dr. Elkin clearly rise to a substantial and specific danger to public health or safety, public policy should similarly be considered. When a Department of Veterans Affairs physician discloses poor medical treatment that does not meet standards of care, especially when there is an actual risk of severe and entirely avoidable medical emergencies, they ought to be protected from retaliation. Once again, we are not asking this court to find that the petitioner was a victim of reprisal. We are only asking the board consider whether he was retaliated against in full consideration of what should have been considered protected disclosures. One of Dr. Elkin's disclosures is that the facility was not staffed during their lunchtime. Though the record shows that the facility accepted walk-ins as urgent care patients and that leadership specifically referred to the facility providing urgent care services, the administrative judge found that there were no issues with the facility failing to prepare for such patients during lunch hours. There was an instance where a diabetic patient entered the facility with severely low blood sugar. If Dr. Elkin had not voluntarily worked through his lunch to see the patient, it could have resulted in dire consequences. Dr. Elkin diagnosed the condition through guesswork because there were no nurses available and he did not have access to their medical cards, so he was not able to actually check the patient's blood sugar. Luckily, he assumed there was a low blood sugar, gave the patient food, and when a nurse became available, it was discovered that yes, the patient's blood pressure had been critically low but was recovering based on the added glucose. If the delays in the availability of the nursing cards was enough to constitute a protected disclosure in Chavez, then it is entirely inconsistent to find the complete lack of availability of any nursing card would not clearly constitute a protected disclosure here. Can you remind me again what the board said about that incident? What the board said here or in Chavez? Here. The board said that this facility was not an emergency facility, despite the fact that there was testimony saying that they took urgent care and did urgent care and walk-ins. They said because it was not an emergency care facility, it was a primary care facility that accepted patients for appointments, that it did not have an obligation to remain open during lunch hours. Plenty of facilities that take walk-in patients do close during lunch hours for appointments. However, if you're an urgent care facility, there needs to be at the very least an intake nurse and doctor available because if you have an urgent care patient that comes in with an emergency medical situation, they either need to be treated or they need to be transferred elsewhere and transferred. But you can't have a situation where you have veterans walking in during lunch hour expecting urgent care treatment only to learn that apparently everybody is off to lunch and they sit there with a low blood sugar, potentially going into a hypoglycemic event in which the patient at worst once again can pass out and die in a diabetic coma. You are into your rebuttal time. You can continue or save the time. I will save my time for rebuttal. Thank you very much. Mr. Burke. Good morning, Your Honor. May it please the Court. This Court should reject the reweighing of the evidence request made by the petitioner in this case. The board's opinion below is supported by substantial evidence in that Dr. Elkin in this case failed to establish he had a reasonable belief that any of the communications that he had made constituted protected activity under the statute or predicted disclosures otherwise. Turning to the initial point made by counsel opposite, the hostile work environment finding below was simply not challenged in the opening brief at pages 29 to 30, make at most a skeletal argument about the other personnel action at issue, which is the involuntary resignation. There has been no argument made about the hostile work environment in the opening brief in this case. Therefore, that argument should be waived. In the event, even if the Court were to address that argument, whether a protected disclosure or a communication is protected logically has no bearing on whether a petitioner makes that a hostile work environment theory as a personnel action. The protection of a disclosure has no bearing on that as a logical matter, and to the extent the Court finds the argument about the hostile work environment to be waived, there would be no reason for the board to revisit that finding on a potential remand if the Court were inclined to do that. To Judge Cunningham's point about credibility determinations, yes, much of a petitioner's argument in this case is a request to reweigh those determinations. To the extent that the petitioner makes a point about the Hillen factors in his opening brief at page 25, that argument we established in our response brief is waived as well for being undeveloped. We pointed out in any event that at pages 37, 40, 41, 72, and 75 of the appendix, there's ample evidence of the board below applying the Hillen factors as this Court does not require a mechanical application of those factors, and there's ample evidence here that the judges below identified the factual questions, identified the varying evidence on those questions, and resolved issues of credibility based on the record. Turning to the disclosures at issue in the case, the overarching... Can you address the two that I think we heard argument about, one having to do with blood pressure and one having to do with a diabetic person coming in at the lunch hour and finding a nurse? Yes, Your Honor. To the first point that opposing counsel mentioned about the blood pressure readings, as an initial matter, we're talking here about a very skeletal record of what those disclosures were. There's an April 2016 allegation of communications verbal with the clinic manager. There's testimony in the record from Dr. Elkin as to what those communications were, and there's controverting testimony about what the manager of the clinic understood those communications to be. The board below weighs the testimony, finds that as a general matter, the evidence suggests, in weighing the testimony, and this Court does not re-weigh the evidence, that the problem was, more appropriately, that Dr. Elkin had a pin chant for measuring blood pressure multiple times, using multiple different methods, and that the issue was not really about patient safety or a substantial and specific danger to public health or safety, but in any event, the board, in going on to a judge, the September 2016 written disclosure about blood pressure, and that simply said, quote, unquote, two words, that there were, quote, unquote, major errors regarding blood pressure. No additional explanation as to what those major errors were, nothing about the cause of those major errors, and when there is additional evidence in this record as to other causes outside of nurse error that would have caused discrepant readings between the intake blood pressure and what the examining doctor, Dr. Elkin, would find upon examination. So we're left with, we're devoid of any, as the board found, any explanation as to those alleged disclosures of a substantial and specific danger to public health or safety. The opposing counsel pointed to the case Perique from the board. There was much more explanation in the disclosures at issue about delayed and mismanaged patient care. There was, as the board put it, confidential patient information that the appellant included in the disclosures, relating to particular examples of alleged mystic diagnoses and misdirection of patients within a hospital. That simply does not exist in this case. That level of detail does not exist in this case. And again, he would also address the Chavez case. It sounded like he was relying on that, at least in the argument. Correct. And the Chavez case, opposing counsel relied on more specifically with regard to the nursing support disclosure. But that case, as well as is distinguishable from this case in that, first of all, it's in a hospital setting where patient care is more acute or patient demands may be more acute. And in any event, in that case, whereas it was found that a delay in patient care was not subject to a, quote-unquote, chain of unlikely events, here, the nursing support issue that Dr. Elkin alleges to have disclosed is, as the board found, only going to occur based on a chain of unlikely events. The board, in considering the nursing support disclosure, found that at most, this is a policy disagreement about when nurses should be on duty and when they should not. Because crediting the manager of the clinic's testimony, the board understood, based on her testimony, that it was rare for there to be patients in the clinic at the time Dr. Elkin had alleged patients were there and needed to have adequate coverage. Turning to the hypoglycemic, seemingly hypoglycemic patient that Dr. Elkin focused on below and before this court, as well, the testimony, the evidence before the board points to the unreasonableness of believing that that circumstance was a substantial and specific danger to public health or safety. Because, as the board found, there was a physician, and this is at Appendix 13, there was a physician, a nurse, and a receptionist, all occupying the clinic at the time, and another nurse arrived within minutes. So we're talking about no delay in patient care, as Dr. Elkin would want the court to believe. And the reasonableness of that belief is certainly undercut by the presence of those other persons able to attend to that matter, as rare as it was. Dr. Elkin, also before this court, just to go back here on our note, we talked about, I was diverted talking about Chavez to the nursing support disclosure, but I do want to make one additional point about the blood pressure before I close. Before this court and before the MSPB, the full board, there was a focus on a diary entry about a discrepancy in systolic blood pressure between 118 at the intake and 200 at the actual examination. That is a diary entry unaddressed to anyone. That is not a disclosure to anyone of a substantial and specific danger to public health or safety. To the extent petitioner continues to focus on that, it simply is misplaced. Let me just see if I'm understanding. There are kind of three potential disclosures being discussed. One, you just mentioned the diary, which is just not a disclosure because it wasn't sent to anybody. I think that's what you said. Then you had this two-word major error disclosure, and that the board said, whatever else that is, that's not specific. The one that you talked about first. It was the April 2016 verbal communications between Dr. Elkin and the manager of the clinic. To a person that constitutes a disclosure recipient under the statute. That was understood to be a disclosure below and we not challenged that. What did the board say was inadequate about that one? That was weighed against testimony by the clinic manager before the board and determined to be more appropriately categorized as a difference of opinion about how blood pressure should be taken. Again, there's evidence in the record that Dr. Elkin was, for lack of a better term, obsessive about blood pressure. He wanted it taken multiple times, using multiple methods, multiple arms, multiple times, different procedures. However, having received testimony, the board received testimony about the fact that blood pressure taking was a regimented protocol. None of the other clinicians testified to there being any risk. Did the board determine that even if it were true, what he stated, that wouldn't be a substantial danger, or that he couldn't reasonably believe that it was a substantial danger?  That's a statutory concept. But the board was weighing the testimony as well, and that Dr. Elkin was testifying that he had a reasonable belief that he had disposed a substantial and specific danger to public health or safety. But in weighing the testimony and weighing the rest of the evidence in the record, the board found that that reasonable belief was not proven, in that there was countervailing evidence in the record undercutting the reasonableness, regimented procedure in taking blood pressure, more appropriately considered to be a difference in medical judgment about when and how blood pressure should be taken, but not that there actually was any danger to anybody based on how blood pressure was being taken. And again, in this September 2016 email that we have, the only written disclosure we have about this blood pressure issue, it is simply a bought allegation that there were major errors in how blood pressure was taken. At the end of the day, again, going back to Judge Cunningham's initial point, petitioner requests the court to re-weigh the evidence and reassess the credibility of the witnesses below, and that is not this court's province on the senator review at issue. And if there are no further questions, I can conclude. Thank you. Thank you, Your Honor. I want to just start by addressing kind of the last bit of the discussion here. First of all, Dr. Elkin did not want or require that blood pressure be checked by nurses three different times in different arms. He was articulating some of his best practices and beliefs, but his only requirement is that the nurses do it correctly, that now there's electronic means of reporting blood pressure that are fairly accurate and reliable, and yet he had nurses doing it manually and grossly inaccurately. And it wasn't the first time he had had issues with this in the past, which is part of the reason he became so obsessive here. But regarding challenges to the factual findings below, the one area that I think is the most subject to question is the judge's conclusion about whether or not he had a reasonable belief regarding the blood pressure that there was a substantial or specific danger. And one of the reasons the judge states because a name wasn't provided, as we've addressed in the briefs, he states in his email that I'm not providing a name here because it's encrypted, but then had an oral conversation in which he discussed the patient with his supervisor. So a name was provided. But even with that, that doesn't really matter, as I discussed with Chambers. It's a name, place, or thing is not specified, with or being the operative word. If there's none of that available, then it's clearly not specific. But even if he said I had a patient yesterday at 4 p.m. and this is what happened, that's specific enough for the manager to know what's going on, what the error is, and that it needs to be corrected, which is the crux of the whistleblower disclosure. Regarding the hospital work environment being waived, this is really kind of how we're looking at this as cause and effect. You have the protected disclosures, which are the cause, and then the effect being the reprisals that take place. And those are informed in the context of those protected disclosures. It's a factor that has to be considered when looking at something like a hospital work environment, whether or not it is illegal, you have to determine if the actions being taken were a result of these disclosures. And as I've already explained, for example, with blood pressure, it was determined that the genesis, at least in Dr. Elkin's admission that the genesis is kind of hostile treatment by nurses, came with the blood pressure disclosure. Well, because that was not ruled a disclosure, that wasn't even lumped in with the analysis of the hospital work environment. So we're not asking this court to actually make a ruling that there was or was not a hospital work environment. We believe that's an issue for the trier of fact. What we're asking is to send it back down so that they can examine that in full context of all the protected disclosures that were made and determine if, in light of those protected disclosures, the hospital work environment took place. The other point I wanted to address briefly is that one of the cases was differentiated based on the fact that there was more of a hospital setting. And I wanted to emphasize that this is a rural VA treatment center. Patients were traveling sometimes several hours. That was actually, and it hasn't really been discussed in argument, but one of the disclosures was regarding the nebulizers. And that was one of the reasons that he preferred those is because when patients are several hours away from a healthcare facility, they need a more effective means of stabilizing themselves from a breathing event with a nebulizer because they might become incapacitated and they're not going to be able to administer an inhaler. In that same context, you have patients traveling for multiple hours. So on average, these patients might be a little bit sicker than your average patient because it's a major inconvenience to get there, which is part of the reason why the workload issue took place because he's dealing with patients that aren't coming in very often and that are very sick. But just comparing it to a hospital, a patient can die at either facility. Just because it's not a hospital doesn't mean a patient who's very sick and has the misguided notion of, I should drive to this VA center rather than a hospital. If they're there and they're untreated for an hour and their condition worsens and they could have been transferred immediately, that's an unacceptable delay. And Chavez, we're talking about a delay in patient care because the nurse was a few minutes delayed at the beginning of a shift and that was significant enough to rise to a protective disclosure, so this should be too.